333 F.2d 761
 The PIANO AND MUSICAL INSTRUMENT WORKERS UNION, LOCAL NO. 2549 OF the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, Plaintiff-Appellee,
v.
W. W. KIMBALL COMPANY, a Delaware corporation, Defendant-Appellant.
 No. 14446.
 United States Court of Appeals Seventh Circuit.
 June 30, 1964.
 
 Thomas R. Mulroy, Chicago, Ill., Fred P. Bamberger, Evansville, Ind., Ralph E. Davis, Luther A. Harthun, Chicago, Ill., Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., of counsel, for appellant.
 Bernard M. Mamet, Chicago, Ill., for appellee.
 Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 W. W. Kimball Company, a Delaware corporation, defendant, has appealed from an order of the district court granting summary judgment on count I of a complaint of The Piano and Musical Instrument Workers Union, Local No. 2549 of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, plaintiff, under 29 U.S.C.A. § 185, being § 301 of the Labor Management Relations Act.
 
 
 2
 Relevant pleadings and exhibits affirmatively show the following facts.
 
 
 3
 Defendant was engaged in the business of manufacturing pianos and organs at its plant at Melrose Park, Illinois.[1] On October 1, 1960 it entered into a collective bargaining agreement with plaintiff, which by its terms expired October 1, 1961. On August 15, 1961, defendant notified plaintiff by letter that it had decided because of economic necessity to "discontinue operations in Melrose Park immediately" and that it would "begin immediately to lay off the employees". Production operations at Melrose Park ceased on August 17, 1961.
 
 
 4
 Defendant transferred its manufacturing operations to a plant at French Lick, Indiana. On October 9, 1961, it began hiring employees for the French Lick plant. No operations were carried on in that plant prior to that date.
 
 
 5
 The 1960 agreement provided for seniority rights for a period of two years following lay-off for those employees who had one or more years' service with the defendant. In the case of lay-off, provision was made for re-employment in the order of seniority, in which case defendant was to give written notice by mail to each employee to report back to work within three days after mailing of the notice, failing which the next employee in seniority might be re-employed. An employee who failed to show good cause for failure to report within three days would lose his seniority standing.
 
 
 6
 These are the principal seniority provisions upon which plaintiff relies as a contractual basis for its position with respect to the re-employment rights of the employees. The 1960 agreement also provided, in Article VIII, section 1:
 
 
 7
 "Any difference arising from the interpretation or application of this agreement between the parties hereto, which cannot be settled directly by the parties concerned, will be referred to a board of arbitration * * *."
 
 
 8
 While defendant's motion for summary judgment was denied, plaintiff's motion for summary judgment as to count I was granted.[2] It prayed for arbitration of the disputed issues as to the rights of laid-off employees to be "recalled" to work at the French Lick plant also their right to collect damages for lost wages and other benefits, together with costs and attorneys' fees.
 
 
 9
 On August 15, 1961, vice-president Habig of defendant, notified business agent Kearney of plaintiff, of its decision to discontinue the Melrose Park operation. On September 7, 1961, Habig and A. C. Sermersheim, one of defendant's officers, met with Kearney to discuss what should be done about the employees laid off as a result of the transfer to French Lick. Plaintiff demanded that laid-off employees be re-employed in the new location. As early as September 7, defendant was considering job applicants for French Lick. Kearney said that he had a list of 39 Melrose Park employees who wished to obtain employment at the French Lick plant. Sermersheim requested a copy of this list and Kearney said that he could give him a copy. This Kearney did not do.
 
 
 10
 On September 15, 1961, Sermersheim and James Loftus, defendant's purchasing agent, met with Kearney and Bennett, general organizer of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO. It does not appear that anything was then said or done about the copy of the list which Kearney said on September 7 he would give to Sermersheim.
 
 
 11
 No hiring was undertaken by defendant at French Lick until October 9, 1961.
 
 
 12
 On November 1, 1961, plaintiff again demanded re-employment for laid-off employees and requested back pay until reemployment. On November 14, 1961, defendant's plant manager Domark of the Melrose Park plant and Sermersheim met with Bennett and Kearney. Bennett stated that defendant could be required to offer employment to the Melrose Park employees at French Lick. When Sermersheim asked for a list of employees who desired such employment, Kearney declined to furnish it.
 
 
 13
 On December 14, 1961, defendant asked for a list of employees who desired employment at French Lick, offering to furnish plaintiff with application blanks for those employees seeking employment there. This offer was rejected by Bennett who insisted that re-employment under Article III of the contract be offered to all Melrose Park employees and that defendant contact them for such purpose in accordance with the contract.
 
 
 14
 Such a list was never given to defendant, although in a letter dated January 15, 1962, defendant offered severance and termination pay to Melrose Park employees. Kearney refused this offer in a letter dated January 20, 1962.
 
 
 15
 No recall having taken place, plaintiff on July 30, 1962 offered to submit the "disputed issues" to arbitration, which was refused by defendant on September 1, 1962. This suit followed on September 14, 1962.
 
 
 16
 Defendant insists that the decisive factor, under the arbitration clause, is the time at which the dispute arose. It relies on Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 2 Cir., 312 F.2d 181 (1962), cert. denied 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053. It likewise relies upon Local Union No. 998 etc. v. B. & T. Metals Co., 6 Cir., 315 F.2d 432 (1963), holding that arbitration could not be compelled because a dispute over seniority arose after termination of the collective bargaining agreement.
 
 
 17
 Thus, argues defendant, an application of the Procter & Gamble and B. & T. Metals test to the facts here, requires a holding that the "difference" urged by plaintiff is not arbitrable because it arose after termination of the contract.
 
 
 18
 1. In John Wiley & Sons, Inc., v. Livingston, President of District 65, Retail, Wholesale and Department Store Union, A.F.L.-C.I.O., 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), it appears that Interscience Publishers, Inc. had a collective bargaining agreement with the union and that, while the agreement was in effect, Interscience merged with Wiley and ceased to do business as a separate entity, for genuine business reasons. A major question presented in Wiley was whether a corporate employer was required to arbitrate with a union under a bargaining agreement made between the union and Interscience, a corporation which later had merged with the employer.
 
 
 19
 Because of the extensive reliance by plaintiff in the case at bar upon Wiley (which it cites on eight pages of its brief), we shall now discuss it.
 
 
 20
 The employees involved were employed by Interscience prior to the merger with Wiley. The union sought to arbitrate with Wiley the question, inter alia, whether or not the seniority rights built up by the Interscience employees had to be accorded to such employees by Wiley not only during the term of the Interscience agreement but after its expiration. Wiley contended that it had no agreement with the union and that it was not obligated to recognize the rights of the prior Interscience employees — which rights the union contended had "vested". Wiley not only contended that it was not a party to the agreement and, therefore, not bound by it, but additionally, that, because the agreement did not embrace post-merger claims and because the claims related to a period beyond the limited term of the agreement, the union's grievances were not within the scope of the arbitration clause.
 
 
 21
 376 U.S. at 550, 84 S.Ct. at 915, the court said:
 
 
 22
 "* * * Therefore, although the duty to arbitrate * * * must be founded on a contract, the impressive policy considerations favoring arbitration are not wholly overborne by the fact that Wiley did not sign the contract being construed. * *"
 
 And 376 U.S. at 551, 84 S.Ct. at 915:
 
 23
 "* * * The Union made its position known well before the merger and never departed from it. * * * This Union does not assert that it has any bargaining rights independent of the Interscience agreement; it seeks to arbitrate claims based on that agreement, now expired, not to negotiate a new agreement."
 
 
 24
 As to the specific issue raised in Wiley, whether "the seniority rights built up by the Interscience employees must be accorded to said employees now and after January 30, 1962", the court said 376 U.S. at 554, 84 S.Ct. at 916:
 
 
 25
 "There is thus no question that had a dispute concerning any of these subjects, such as seniority rights or severance pay, arisen between the Union and Interscience prior to the merger, it would have been arbitrable. Wiley argues, however, that the Union's claims are plainly outside the scope of the arbitration clause: first, because the agreement did not embrace post-merger claims, and, second, because the claims relate to a period beyond the limited term of the agreement."
 
 
 26
 The court pointed out that, while in all probability the merger was not contemplated when the agreement was made in 1960, the whole litigation was underlain by the question of what was the effect of the merger on the rights of covered employees? The court said, 376 U.S. at 555, 84 S.Ct. at 917:
 
 
 27
 "* * * We see no reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement and their realization after the agreement had expired. Of course, the Union may not use arbitration to acquire new rights against Wiley any more than it could have used arbitration to negotiate a new contract with Interscience, had the existing contract expired and renewal negotiations broken down."
 
 
 28
 However the court in Wiley, 376 U.S. at 551, 84 S.Ct. at 915, indicated that, for the purpose of passing upon an employer's duty to arbitrate, it might be proper to consider "relevant similarity and continuity of operation across the change in ownership", which was there evidenced "by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty." A study of Wiley reveals a mere absorption by Wiley of Interscience. This was accomplished by Interscience offering to its employees in its only plant, located in New York City, jobs at the Wiley plant located in the same city. Livingston v. John Wiley & Co., 2 Cir., 313 F.2d 52, 54.
 
 
 29
 In the case at bar, a transfer of defendant's employees from a Chicago suburb to southern Indiana would be drastic, if not difficult. Nevertheless the record establishes that plaintiff union, representing the employees, despite requests by defendant, never submitted to defendant a list of employees who desired to go to French Lick to work, a list which it is undisputed Kearney had. Thus we have before us a case which fails to indicate that any employee applied for employment at French Lick, based upon his seniority rights or otherwise, and that the failure of defendant to tender any jobs at French Lick to any employees based upon seniority can scarcely be urged against defendant in view of the circumstance that, absent the list which Kearney did not produce, it had no knowledge of what employees would be willing to make the transfer.
 
 
 30
 Thus in the case at bar we have not a situation where "wholesale transfer" of employees to the French Lick plant could have been made without difficulty. No one with seniority indicated to defendant the slightest desire to go.
 
 
 31
 Again reverting to Wiley, it is clear in that case, that while an Interscience employee might have gotten on the Wiley payroll by reporting for duty at the Wiley plant the day after he completed his last day's work at the Interscience plant, without any movement of the place of residence of himself and family, in the case at bar a transfer from defendant's Chicago plant to its French Lick plant necessarily would involve in most cases the uprooting of a man's family from the community in which it lived and its transportation with its personal belongings, to a new community, in a home to be secured, and a readjustment of the relations of the employee and his family to new neighbors, church and social connections there, a life in a community rural in its nature, in contrast to that under which the family had lived in metropolitan Chicago. The operation at French Lick from the standpoint of the employees was relevantly dissimilar from the operation in Chicago. It is not surprising, in view of the drastic change and the lack of continuity of operation present in the case at bar, that Kearney, although he said he had a list of 39 who wished to transfer, never delivered it or a copy thereof to defendant.
 
 
 32
 2. The district court determined that the question of arbitrability was for the arbitrator to decide. In so doing, it erred. Wiley v. Livingston, supra; Atkinson v. Sinclair Refining Co., 370 U. S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); Brass & Copper Workers Federal Labor Union No. 19322, A.F.L.-C.I.O. v. American Brass Co., 7 Cir., 272 F.2d 849, 853 (1959); cert. denied 363 U.S. 845, 80 S.Ct. 1609, 4 L.Ed.2d 1728.
 
 
 33
 3. From the undisputed facts in the record in this case it appears that the "difference", to which the district court referred as the subject matter of arbitration, arose after October 1, 1961,[3] when the contract in this case expired. This is true even though there were discussions prior to October 1st between defendant and plaintiff's representatives about the rights of employees to be employed at the French Lick plant. At no time during these discussions was the subject of the seniority status of Melrose Park employees discussed with respect to the availability of job opportunities at the French Lick plant and at no time was there a request by any representative of plaintiff that Melrose Park employees be offered employment at the French Lick plant upon a seniority basis.
 
 
 34
 During the existence of the October 1, 1960 collective bargaining agreement, when employees at Melrose Park were laid off, such lay-offs were strictly in accordance with the provisions of said agreement.
 
 
 35
 We hold that the record fails to show that defendant during the term of the agreement in any way violated the seniority rights of any of its employees as to employment at French Lick. We further hold that, during the term of the agreement, there was never any difference between the parties to this case in regard to seniority rights as to employment at French Lick, and that therefore there was no difference which became a proper subject for arbitration.
 
 
 36
 For these reasons, the summary judgment of the district court on count I, in favor of plaintiff, is reversed, with instructions to enter a judgment dismissing the complaint at plaintiff's costs.
 
 
 37
 Reversed with instructions.
 
 
 
 Notes:
 
 
 [1]
 A suburb of Chicago
 
 
 [2]
 221 F.Supp. 461. On defendant's motion, the district court dismissed counts II and III
 
 
 [3]
 The district court, 221 F.Supp. at 463,assumed "that a `difference' arose on October 9, 1961, out of the new hirings at the French Lick Plant," and "that the arbitrability of that difference is the issue * * *." (Italicized numeral 9 supplied.)