James McGUIRE, as President, and Joseph Diovisalvo, as Secretary-Treasurer of Coal, Gasoline, Fuel Oil Teamsters, Chauffeurs, Oil Burner Installation Maintenance, Servicemen and Helpers of New York City and Vicinity, Nassau and Suffolk Counties, New York, N. Y. Local Union No. 553, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Plaintiffs,

v.

HUMBLE OIL & REFINING COMPANY, Defendant.

United States District Court
S. D. New York.

Sept. 30, 1965.

Cohen & Weiss, Samuel J. Cohen, Stanley M. Berman, New York City, Bruce H. Simon, New York City, of counsel, for plaintiffs.

Cravath, Swaine & Moore, New York City, Harry H. Voight, New York City, Melvyn Freeman, of counsel, for defendants.

TENNEY, District Judge.

Plaintiffs move herein, in their official capacities, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, "for the relief requested in the complaint."

In the complaint as drawn, plaintiffs not only request an order directing defendant to arbitrate certain grievances arising under named collective bargaining agreements, but also request that defendant be restrained from pursuing any activities contrary to the provisions of the respective agreements; in effect, a request for specific performance of the collective bargaining agreement provisions. In the view taken of the instant case, defendant will be directed to proceed to arbitration. However, as a necessary corollary of that order is the fact that the continued vitality, if any, of the provisions in question is a matter for the arbitrator to decide. United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891, 895 (3d Cir. 1964). Accordingly, the "other" relief requested will be denied, and, as defendant suggests, the within motion will be treated as one for partial summary judgment, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.

The factual setting of the instant controversy is not disputed and is fully set forth in an opinion by Judge Sugarman, dated February 17, 1965 (opinion No. 30887). The facts are similarly set forth in a decision by the National Labor Relations Board, Humble Oil & Ref. Co., 153 N.L.R.B. No. 111 (July 8, 1965). Therefore, for background, the following is sufficient:

On August 7, 1964, defendant Humble Oil & Refining Company (hereinafter referred to as "Humble") purchased the fuel oil delivery service and installation business of Weber & Quinn and its subsidiary, Burdi Fuel Oil Co., Inc. (hereinafter collectively referred to as "Weber & Quinn"), both of whom had collective bargaining contracts, effective January 1, 1964, through December 15, 1965, with Local 553 of the Teamsters Union (hereinafter referred to as "Local 553" or as "plaintiff"). At that time, plaintiff was recognized under the "Fuel Oil Contracts" with each company as the bargaining representative for the chauffeurs employed and, under the "Servicemen's Contract", as representative for the service, installation men and installation men's helpers. Both prior and subsequent to the purchase, plaintiff made known to defendant its status and requested defendant to acknowledge its obligations under the aforesaid contracts, which defendant refused to do.

In September of 1964, plaintiff, pursuant to the identical arbitration clause in the respective contracts, sought to arbitrate a number of disputes arising out of some 26 categories of alleged refusals by defendant to accede to the demands of plaintiff, in violation of the contracts.[1] Defendant has refused to arbitrate these disputes, contending that the collective

1. The following are the categories listed:
    * 1. Refusal to recognize Local 553 as the exclusive bargaining agent for employees formerly employed by Weber & Quinn and by Burdi Fuel Co., Inc.

    2. Refusal to pay the wages provided in the contracts.

    3. Refusal to observe the hours of work provisions of the contracts.

    4. Refusal to observe the procedures for payment of wages provided in the contracts.

    5. Refusal to allocate work assignments in a manner consistent with the seniority provisions of the contracts.
    6. Refusal to observe the shift schedules provided in the contracts.
    7. Refusal to observe the contractual procedure for replacing employees on the seniority list.
    8. Refusal to pay the wages provided in the contracts for Sunday work and overtime work.
    * 9. Refusal to require employees covered by the contracts to become and re-

bargaining agreements are not binding upon it.

Defendant, a Delaware corporation, is engaged in the production, refining and distribution of petroleum products throughout the United States. Since 1937 its distribution employees have been represented for collective bargaining purposes by the Industrial Employees Association, Inc. (hereinafter referred to as the "Association"), with whom defendant presently has a contract expiring April 30, 1966.

Weber & Quinn employed 14 mechanics and 10 drivers. As of this date it appears that 9 of these mechanics (8 burner service mechanics and 1 truck mechanic) and 4 truck drivers have been employed by Humble. Other employees of Weber & Quinn either have refused the offered employment or failed to pass defendant's physical examination.

The dispute between the parties relates to the legal consequences flowing from the above-cited facts.

The defendant does not appear to seriously question the arbitrability of the issues sought to be arbitrated herein, *qua* arbitrable issues *in vacuo*, but asserts that in the factual setting here presented it is not bound by the collective bargaining agreements entered into between Local 553 and Weber & Quinn, and is equally not bound by the arbitration clause contained therein, nor required to arbitrate any disputes arising therefrom.

main members of Local No. 553 on and after 30 calendar days following the beginning of employment.

10. Refusal to maintain trucks and equipment operated by employees covered by the contracts in proper condition as required by the contracts.

11. Refusal to follow the contractual procedures for filling vacancies in jobs covered by the contracts.

12. Refusal to observe the contractual procedures for the hiring of trucks and other equipment.

13. Refusal to require all work within the categories covered by the contracts to be performed by employees working under and in compliance with the contracts.

14. Refusal to observe the sub-contracting provisions of the contracts.

15. Refusal to recognize the right of Union representatives to visit the Companies' premises.

16. Refusal to recognize the rights of employees to refuse to cross picket lines.

17. Refusal to provide the holidays set forth in the contracts and to pay the wages required for holiday work.

18. Refusal to grant vacations in accordance with the provisions of the contracts.

19. Refusal to recognize the rights of employees relating to workmens compensation insurance, personal injuries insurance, and public liability insurance.

20. Refusal to provide the payments required by the contracts during an employee's absence from work due to appearances in court.

21. Refusal to make the payments required by the contracts during an employee's absence from work pursuant to traffic violations summonses.

22. Refusal to provide the insurance and welfare benefits set forth in the contracts, including group life insurance; accidental death and dismemberment insurance, occupational and non-occupational; weekly benefits for non-occupational accident or sickness not covered by workmens compensation; the Limited Medical Expense Policy; surgical-medical insurance; dental benefits; payments under the Union Optical Plan; Associated Hospital Service coverage; contributions to the Local 553 Hospitalization Trust Fund; and other insurance and welfare benefits set forth in the contracts.

23. Refusal to recognize their personal liability for failure to provide the above insurance and welfare benefits.

24. Refusal to make payments to the Local 553 Pension Fund.

25. Refusal to recognize the authority of the Fuel Industry Union and Management Committee to settle certain disputes as provided in the contracts.

26. Refusal to compensate employees for use of their own cars and for loss of tools as provided in the Servicemen's, Installation Men's, Installation Men's Helpers, and Servicemen Trainees' Contract 1964–1965.

\* In view of the National Labor Relations Board's decision in the unit clarification proceedings, Humble Oil & Ref. Co., 153 N.L.R.B. No. 111, (July 8, 1965) Items 1 and 9 may no longer be arbitrable, but the Court makes no determination on this point.

Accordingly, the issue squarely presented is whether Humble is bound by the collective bargaining agreements entered into between plaintiff and Weber & Quinn, or at least the arbitration clause contained therein, the issue of how much of the contract is binding being left to the arbitrator.

In support of its action to compel defendant to arbitrate under a collective bargaining agreement it concededly never signed or assumed, plaintiff relies, *inter alia*, on John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) and two decisions following it, United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3d Cir. 1964) and Wackenhut Corp. v. International Union United Plant Guard Workers, 332 F.2d 954 (9th Cir. 1964).

In opposition, defendant contends that Wiley is inapplicable by reason of the lack of any substantial continuity of identity between Weber & Quinn and itself, and that, as distinguished from Wiley, in the instant case the successor company has a union representing its employees and to arbitrate with Local 553 would be to dilute the status of the Association as collective bargaining representative of Humble employees. In addition, it argues that by reason of the National Labor Relations Board's decision in the unit clarification proceeding hereinafter discussed Local 553 no longer represents the prior Weber & Quinn employees and therefore lacks any standing to advance these grievances.

■■■ Arbitration is, of course, a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to submit. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Whether or not the company is bound to arbitrate, as well as what issue it must arbitrate, are matters to be determined by the Court on the basis of the contract entered into by the parties. Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962).

■ Similarly, "[t]he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so *a fortiori*, it cannot be compelled to arbitrate if an arbitration clause does not bind it at all." Wiley, supra, 376 U.S. at 547, 84 S.Ct. at 913.

Accordingly, the initial task of this Court is to determine whether the duty to arbitrate has survived the purchase and has devolved upon Humble under the prior executed collective bargaining agreements. In approaching this question I leave to the side for the moment the presence of another union, the Association, a factor not presented in Wiley.

In Wiley, Interscience Publishers had entered into a collective bargaining agreement with a union representing some of its employees. During the life of the contract, Interscience was merged into Wiley, a much larger publishing house, most of Interscience's employees being retained by the successor firm. The union was unable to agree with Interscience, and later with Wiley, as to the effect of the merger on the collective bargaining agreement. The union asserted that under the agreement its members had certain "vested rights" regarding seniority, severance pay and pension fund payments. Wiley would not recognize the union as a bargaining agent and declared that the agreement had terminated with the merger. The union demanded arbitration of its grievances and, when Wiley refused, sued to compel arbitration.

Wiley's position in opposing the union demand, as described by one commentator, "was quite simple. It had not agreed to either the contract or the obligation to arbitrate contained therein and the union plainly was not the representative of a majority of its employees. That position * * * seemed well founded on the consistent rulings of the NLRB and the federal courts that a collective bargaining

agreement does not survive either a change of representatives or as in this case, a basic change in the identity of the employer absent some affirmative adoption of the old agreement by the new party. [Citing: NLRB v. Armato, 199 F.2d 800 (7th Cir. 1952); International Longshoremen's [& Warehousemen's] Union v. Juneau Spruce Corp., 189 F.2d 177 [13 Alaska 291] (9th Cir. 1951), aff'd, 342 U.S. 237 [72 S.Ct. 235, 96 L.Ed. 275] (1952); American Seating Co., 106 N.L.R.B. 250 (1953); Cruse Motors, Inc., 105 N.L.R.B. 242 (1953); Stonewall Cotton Mills, 80 N.L.R.B. 325 (1948); Herman Lowenstein, Inc., 75 N.L.R.B. 377 (1947)]." Christensen, Labor Relations Law, 1964 Ann.Surv.American Law, 155, 156–157.

■ The Supreme Court, referring to the strong preference for arbitral settlement of industrial disputes, held that "the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." 376 U.S. at 548, 84 S.Ct. at 914.

■ Defendant, in an attempt to distinguish Wiley, cites the following language:

"We do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives. As indicated above, there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." (Id. at 551, 84 S.Ct. at 915.) Defendant then argues that in the case at bar there is lacking this substantial identity in the business enterprise.

The facts, however, bearing in mind the rationale for the Supreme Court's decision, would appear to lead to a contrary conclusion.

Weber & Quinn and Burdi were engaged in the sale of fuel oil, as is the defendant. In Wiley, both employers were engaged in the publishing business.

In both Wiley and in the case at bar, the successor employer is a larger concern than its predecessor, and in both cases the successor utilized the physical plant and equipment of its predecessor. At the time of demand for arbitration and institution of suit, Humble utilized Weber & Quinn's office in Brooklyn, but it has since been closed. Weber & Quinn's panel and delivery trucks are being used by Humble, though they have been repainted and moved either to its Brooklyn or Queens offices. The former Weber & Quinn employees who have been hired are now working out of Humble's offices, and in that sense have been integrated into Humble's existing structure. In Wiley, as well, the employees hired were transferred to the Wiley plant and presumably once there were not segregated from the Wiley employees but were integrated into the work force. (The union in Wiley represented 40 employees in the Interscience plant, 29 of whom went to work for Wiley and were "absorbed" into the larger Wiley work force of 380. Affidavit of Francis Lobdell, Livingston v. John Wiley & Sons, Inc., 62 Civ. 378). In addition, they perform the same tasks as when they worked for Weber & Quinn. Insofar as billing is concerned, pursuant to the contract of purchase the former Weber & Quinn accounts are segregated and billed on special billing forms which refer to Weber & Quinn as a division of Humble Oil & Refining Company, and the address printed thereon is the address of the Weber & Quinn & Burdi Brooklyn offices, respectively. The accounts, though, are serviced the same as the other Humble accounts.

■■ The Supreme Court laid down no guidelines to define when a successor employer, due to the lack of substantial continuity of identity with its predecessor will not be held to a duty to arbitrate.

However, it has been observed that "only unusual circumstances will relieve a successor firm from a duty to arbitrate grievances arising out of its predecessor's contract." The Supreme Court 1963 Term, 78 Harv.L.Rev. 179, 288 (1964). I am of the opinion that the point of reference in successor employer situations arising in the context of continued viability of an arbitration clause, as opposed to the claim of a certified union for continued representative rights, or even the claim of a union for continued bargaining rights, is not the physical location of the employing industry and the fact that the employees are working out of different offices with different supervisors, but rather the similarity in work performed by the employee, the similarity in the employing industry, and in the employment relationship. As noted above, all of these criteria are present in the instant case.

Thus, for example, in Piano & Musical Instrument Workers Union v. W. W. Kimball Co., 333 F.2d 761 (7th Cir.), rev'd, 379 U.S. 357, 85 S.Ct. 441, 13 L. Ed.2d 541 (1964) (Per curiam), the defendant manufacturer was engaged in the business of manufacturing pianos and organs at its plant at Melrose Park, Illinois. The collective bargaining agreement with plaintiff union was entered into on October 1, 1960 and expired October 1, 1961. On August 15, 1961, defendant notified plaintiff that it was discontinuing its operation in Melrose Park and that it would begin laying off employees immediately. The defendant transferred its manufacturing operations to a new plant at French Lick, Indiana, and on October 9, 1961, began hiring employees for the French Lick plant.

Under the collective bargaining agreement there was provision made for seniority rights of certain employees for a period of two years following lay-off. Discussions between plaintiff and defendant both prior and subseqent to October 1, 1961, relating to the rehiring of the Melrosc Park employees at the French Lick plant were of no avail. On July 30, 1962, plaintiff offered to submit the "disputed issues" to arbitration, which offer was refused by defendant and suit was commenced on September 14, 1962.

The Court distinguished Wiley as follows:

"A study of Wiley reveals a mere absorption by Wiley of Interscience. This was accomplished by Interscience offering to its employees in its only plant, located in New York City, jobs at the Wiley plant located *in the same city.* * * *

In the case at bar, a transfer of defendant's employees from a Chicago suburb to Southern Indiana would be drastic, if not difficult. * * * [333 F.2d at 764]. [I]t is clear in [Wiley] * * * that while an Interscience employee might have gotten on the Wiley payroll by reporting for duty at the Wiley plant the day after he completed his last day's work at the Interscience plant, without any movement of the place of residence of himself and family, in the case at bar a transfer from defendant's Chicago plant to its Frenⅽh Lick plant necessarily would involve in most cases the uprooting of a man's family from the community in which it lived and its transportation with its personal belongings, to a new community in a home to be secured, and a readjustment of the relations of the employee and his family to new neighbors, church and social connections there, a life in a community rural in its nature, in contrast to that under which the family had lived in metropolitan Chicago." (Id., 333 F.2d at 765.)

Based on the foregoing factors, the Court held that "[t]he operation at French Lick from the standpoint of the employees was relevantly dissimilar from the operation in Chicago." (Ibid.)

Applying that criteria to the case at bar of course necessitates the conclusion that there is sufficient continuity of identity.

In addition, the Court held that while there were discussions prior to the ter-

mination of the contract between plaintiff and defendant about the rights of the employees to be employed at French Lick, there was no specific reference during those discussions to the seniority status of the Melrose Park employees with respect to the availability of job opportunities at the French Lick plant and no request by plaintiff that Melrose Park employees be offered employment at the French Lick plant upon a seniority basis. The Court noted that the "difference" between the parties arose on October 9, 1961, when new employees were hired at the French Lick plant, at a point in time subsequent to the expiration of the collective bargaining agreement. Thus the Court held that there was no "difference" during the course of the agreement relating to seniority rights and that, therefore, there was no "difference" which became a proper subject of arbitration.[2]

The Supreme Court, however, in a *Per curiam* opinion, stated:

"The petition for a writ of certiorari is granted and the judgment is reversed. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, and John Wiley & Sons. Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898." Piano & Musical Instrument Workers Union v. W. W. Kimball Co., 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964).

Returning to the factual similarities between Wiley and the case at bar (see p. 118 supra), can this Court hold that the factual pattern herein presents the "unusual" case where there is such a "lack of any substantial continuity of identity in the enterprise" so as to make Wiley inapplicable? I think not, for the rationale underlying the Supreme Court's decision in Wiley which forged new ground in employer-employee relationships, is equally applicable in the instant case.

The focal point of reference is the employee who is doing the same type of work, in the same industry in the same city, but for a different employer. Viewed from this standpoint, his "well being" was as incidental to the purchase by Humble as were the interests of the Interscience employees at the time of merger, and the possibility of his being disadvantaged was at least as great as well. Indeed the reasoning of the Supreme Court in Wiley that employee rights and interests are often affected by changes in corporate ownership but are largely ignored by those effecting such changes, is no less persuasive in the case at bar. The "rights" that the former Weber & Quinn employee has asserted through his representative are as vested or unvested as those of the Interscience employees, but his right to at least arbitrate their continued viability stands on the same footing as those of the Interscience employees. He is equally in need of the same protection as that accorded in Wiley. He, through his representative, sought to ensure certain rights by entering into a collective bargaining agreement, variously described "not [as] an ordinary contract * * * [But rather as a] 'generalized code'", (Wiley, supra, 376 U.S. at 550, 84 S.Ct. at 914) covering the entire relationship, or, as the common law of the shop, a piece of legislation enacted by a society—the industrial community—to govern that community. (58 L.R.R. 234.) The agreements between plaintiff as representative of Weber & Quinn employees and Weber & Quinn date back to 1933 and have been renewed continuously thereafter.

■ Neither plaintiff nor its members took part in the purchase negotiations and understandably those negotiations involved more the well-being of the selling and purchasing employer than the employee upon whom the sale perhaps had the greatest impact. These employees, through Local 553,[3] now assert that certain rights under those agreements are vested and due and owing them notwithstanding the change of ownership

---

2. The decision is criticized in Christensen Labor Relations Law, 1964 Ann.Surv. American Law 155, 158–159.

3. The representative status of Local 553 will be discussed infra.

which Humble asserts *eo instanti* severed those rights, and I am of the opinion that at least the right of these employees to arbitrate these grievances was not severed by the sale and that the duty to arbitrate devolved upon Humble.

Bearing in mind the utility of the arbitration process and its ability to adapt as the circumstances require, and the considerations that were of prime importance to the Court in Wiley, I hold that there is a sufficient continuity of identity presented herein between the prior employer and Humble as to impose upon Humble the duty provided by the agreements, to arbitrate disputes arising thereunder. I thus find an insufficient factual difference between Wiley and the case at bar as to require me to reach a different conclusion than the one reached therein.

■ Nor do I consider the presence of the "Association",[4] the union representing Humble employees, or the Board's decision on the unit clarification petition, of sufficient importance to lead to a conclusion contrary to the one I have reached herein.

At the time the demand for arbitration was made and suit instituted, Local 553 represented the former Weber & Quinn employees and as of that time accordingly represented the employees covered by the agreement which is in dispute and out of which Humble's duty to arbitrate arises. Cf., Wiley, supra, at 551 n. 5, 84 S.Ct. 909; Truck Drivers & Helpers Local Union No. 696 v. Grosshans & Peterson, Inc., 209 F.Supp. 164, 168, 169 (D.Kans.1962); notes 8, 10, infra. In addition, the rights of former Weber & Quinn employees, not hired by Humble, are also being pressed herein. See also Chemrock Corp., 151 N.L.R.B. No. 111 (March 28, 1965).

The Supreme Court in Wiley, supra, 376 U.S. at 551–552 n. 5, 84 S.Ct. at 915, stated that "[t]here * * * [was] no problem of conflict with another union, cf. L. B. Spear & Co., 106 N.L.R.B.

687, since Wiley had no contract with any union covering the unit of employees which received the former Interscience employees."

■ Under Wiley, Humble—by reason of the circumstances already alluded to—became a party to the code that governed the employment relationship between Weber & Quinn and its employees, represented by Local 553. The presence of the Association, while a factor that may be considered by the arbitrator, in no way lessens the impact of the business transaction on these employees and in no way dilutes the rights that they assert exist and the lack of recognition which they seek to arbitrate. At the most, the presence of the Association is a factor to be weighed in determining whether "other considerations [are so] compelling" (Wiley, supra, at 549–550, 84 S.Ct. at 914) as to overcome "[t]he preference of national labor policy for arbitration as a substitute for tests of strength between contending forces." (Ibid.) However, viewing the transaction as I have from the standpoint of the employee with alleged rights, caught in the middle of a business transaction, I do not believe that it is a sufficient consideration to outweigh the rationale for the Supreme Court's striking out into *"terra incognita"* in the Wiley decision.

> "Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees

---

4. Research has failed to reveal any post-Wiley decision wherein the successor em-

ployer's employees were represented by another labor organization.

from a sudden change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by "the relative strength * * * of the contending forces," United Steelworkers of America v. Warrior & Gulf [Nav. Co.], supra, 363 U.S. [574] at 580 [80 S.Ct. 1347, 4 L.Ed. 2d 1409]." Wiley, supra, at 549, 84 S.Ct. at 914.

■ The presence of the Association would thus appear to go more to the remedy to be shaped by the arbitrator than to the preclusion of the right to assert the grievances and arbitrate the existence or non-existence of rights under the collective bargaining agreement.

The reason for the developing preference for the resolution of labor controversies by way of arbitration is best revealed by the arbitrator's decision in S. B. Penick & Co., 43 Lab.Arb. 798 (March 3, 1964).

The issue there posed involved an attempt by a union to extend and enforce rights such as seniority, severance pay and pension plan (id. at 803) which became vested under a contract with Parsons, the predecessor employer, against another company—Penick—which bought out Parsons and moved the operation to its own plant as soon as the collective bargaining agreement expired. In addition to the Wiley problem thus presented was the additional complicating factor that Penick's own employees were represented by another union.

The opinion by arbitrator Turkus, in which he cites and discusses the Court of Appeals opinion in Wiley (Livingston v. John Wiley & Sons, Inc., 313 F.2d 52 (2d Cir. 1963)), and its impact on the problem before him (and on the basis of which he held the duty to arbitrate to have survived the purchase and the issues presented arbitrable) demonstrates the usefulness of arbitration as a grievance procedure and the full range and

spectrum of tools at the arbitrator's disposal in reaching an equitable resolution of the problems presented.

There is, of course, a possibility, as the Supreme Court noted in Wiley, that "[p]roblems might be created by an arbitral award which required Wiley to give special treatment to the former Interscience employees because of rights found to have accrued to them under the Interscience contract. But the mere possibility of such problems cannot cut off the Union's rights to press the employees' claims in arbitration. While it would be premature at this stage to speculate on how to avoid such hypothetical problems, we have little doubt that within the flexible procedures of arbitration a solution can be reached which would avoid disturbing labor relations in the Wiley plant." Wiley, supra, 376 U.S. at 551–522 n. 5, 84 S.Ct. at 915–916.

■ Similarly, in the case at bar, it is conceivable that an award on the grievances presented would create "problems" due to the presence of the Association; however, to presume that such will be the fact is to ignore the Court's mandate in Wiley.

With respect to the Board's decision on the petition for unit clarification, it is not dispositive of the issues presented.

The Court, in the hope that the Board's decision would cast some light on this developing and shadowy area of law, stayed its hand until that decision was rendered. The Board, however, specifically and quite explicitly limited its decision to placing the former Weber & Quinn employees into "the production and maintenance unit currently represented by Industrial [the Association] on an exclusive basis." (153 N.L.R.B. No. 111 at 3.) With respect to the problem before this Court, the Board cryptically stated: "Whatever Petitioner's [Humble's] obligations with respect to Local 553's contract with Weber & Quinn are, such obligations cannot operate as a bar" to the inclusion of the former Weber & Quinn employees in the Association unit. (Ibid.) "Similarly, Local 553's contrac-

tual right to arbitrate disputes from its relationship with Weber & Quinn does not preclude the Board from determining a question concerning the appropriateness of a unit for the purposes of collective bargaining." (Ibid.)

The Board thus seemingly drew a distinction between the contractual rights of Local 553 and the former Weber & Quinn employees vis-a-vis Humble, and the status of the Association and the former Weber & Quinn employees vis-a-vis Humble "for the purposes of collective bargaining." Indeed, the Supreme Court in Wiley stated: "[W]e do not suggest any view on the questions surrounding a certified union's claim to continued representative status following a change in ownership. See, e. g., National Labor Relations Board v. Aluminum Tubular Corp., 2 Cir., 299 F.2d 595, 598–600; National Labor Relations Board v. McFarland, 10 Cir., 306 F.2d 219; Cruse Motors Inc., 105 N.L.R.B. 242, 247. This Union does not assert that it has any bargaining rights independent of the Interscience agreement; it seeks to arbitrate claims based on that agreement * * * not to negotiate a new agreement." (Id. at 551, 84 S.Ct. at 915.) See also Livingston v. John Wiley & Sons, Inc., 313 F.2d 52, 57 n. 3 (2d Cir. 1963); note 8, infra.

The decision of the Board as plainly stated held that the former Weber & Quinn employees are to be considered in the Association unit for collective bargaining purposes. It did not, however, discuss Humble's contractual obligations to these employees as presented by their representative who negotiated the contract on their behalf.

The procedure, pursuant to which the Board undertook to clarify the unit in the instant case was one recently adopted (Brotherhood of Locomotive Firemen & Enginemen, 145 N.L.R.B. 1521 (1964)), which overruled prior established procedure and precedent (The Bell Telephone Co., 118 N.L.R.B. 371 (1957)). This newly-adopted procedure permits a petition for unit clarification, though the unit in which the clarification is sought has not been certified by the Board.

The impact of this new procedure and the effect of the Brotherhood of Locomotive Firemen & Enginemen decision, supra, have not as yet been ascertained (see, e. g., Crown Zellerbach Corp., 147 N.L.R.B. 1223 (June 30, 1964); New Fashion Cleaners, Inc., 152 N.L.R.B. No. 16 at 5 n. 7 (May 5, 1965)), and Humble has not shown either by citation or argument that an administrative decision on a unit clarification petition in a non-certified unit is in any way analogous to the decertification of a collective bargaining representative. See, e. g., Glendale Mfg. Co. v. Local 520 International Ladies' Garment Workers' Union, 283 F.2d 936 (4th Cir. 1960),[5] cert. denied, 366 U.S. 950, 81 S.Ct. 1902, 6 L.Ed.2d 1243 (1961); International Telephone & Telegraph Corp. v. Local 400, Int'l Union of Elec. Workers, 248 F.Supp. 949 (D.N.J. July 12, 1965); but cf., United Elec. Workers v. Star Expansion Indus., Inc., 246 F.Supp. 400 (S.D.N.Y. April 13, 1964).[6]

---

5. In Glendale, the decertified union was seeking to act as the collective bargaining representative of the employees concerning the matter of negotiation of wages pursuant to a reopening clause in the agreement, and, in fact, the arbitrator's award directed both the employer and the decertified union to negotiate and "bargain on the subject of the employees' wages," (id. 283 F.2d at 938)—a situation quite dissimilar from that presented herein.

6. Indeed, the entire rationale behind the decisions in the decertification cases, namely, that a majority of the employees have, by way of election, repudiated their repre-

sentative and have chosen another to represent them, and the resultant effect of decertification on the right of the decertified representative to continue to press the rights of employees, is wholly inapplicable in the instant case. For in our case the Association is not a certified union and, therefore, there has been no election under the aegis of the N.L.R.B. and, more important, treating these employees as accretions to the Association unit, they will come under the Board rule denying a self-determination election to employees held to be accretions to an existing unit. See Borg-Warner Corp., 113 N.L.R.B. 152 (1955), petition to review denied

Moreover, in none of those cases was a Wiley situation presented and, accordingly, none had the opportunity to decide the possible impact of Wiley on the problem. And, in fact, there is a growing tendency after Wiley to bind a successor company to part if not all of the predecessor's duties. See Chemrock Corp., 151 N.L.R.B. No. 111 (March 28, 1965); N.L.R.B. General Counsel's "Report on Case-Handling Developments at N.L.R.B.", Quarter Ending Dec. 31, 1964, 58 L.R.R. 105, 108–09, in which the General Counsel concludes that a successor employer who continues the predecessor's business with a continuity of identity must not only bargain with the union which represented the predecessor's employees but must also give continued effect to the predecessor's labor contract; see also Wirtz v. Ocala Gas Co., 336 F.2d 236 (5th Cir. 1964).

Indeed, due to the impact of Wiley, the Board may very well have to re-examine its entire section 9 procedure and, in the process, overrule many time-honored precedents.[7]

Plaintiff does not desire to negotiate a new contract with Humble nor does it desire to represent these former Weber & Quinn employees *in futuro*. That, the Board has held, is the function of the Association. What plaintiff does desire is to submit certain grievances to arbitration on behalf of its members who had chosen it to be their representative and to press claims on their behalf under an agreement that plaintiff negotiated and to which it was a party on behalf of and representing these employees—an agreement which is still viable and binding on Humble.[8] It cannot definitively be said

sub nom. International Union, United Auto, Aircraft and Agr. Implement Workers v. NLRB, 231 F.2d 237, 243 (7th Cir.), cert. denied, 352 U.S. 908, 77 S.Ct. 146, 1 L.Ed.2d 117 (1956); Radio Corp. of America, 141 N.L.R.B. 1134 (1963).

7. In a paper delivered at the Eighteenth Annual Conference on Labor, sponsored by the New York University Institute on Labor Relations, Sol G. Lippman, Esq., presages that Wiley will cause a fundamental change in the Board's representation case policies in successorship situations. 58 L.R.R. 234. The papers of Mr. Lippman and of the other participants who discussed the Wiley problem (Joseph Barbash; David Feller; John E. Jay) are shortly to be published. The first of the Board's time-honored precedents which may have fallen is the General Extrusion doctrine (General Extrusion Co., 121 N.L.R.B. 1165 (1958)), wherein the Board held that a contract with the predecessor will not bar an election after a sale unless the successor employer has "bound himself to assume the bargaining agreement." See Grainger Bros. Co., 146 N.L.R.B. 609 (1964); compare Triumph Sales, Inc., 154 N.L.R.B. No. 71 (Sept. 5, 1965) at 4 n. 8, 5 n. 12.

8. In Trumbull Asphalt Co., 38 Lab. Arb. 1093 (1962), a union was held to be entitled to represent employees in arbitration of a grievance where the grievance arose and the arbitrator was appointed prior to a decertification election. The Board of Arbitrators, after distinguish-

ing, *inter alia*, Glendale, supra, and differentiating between grievance adjustment and collective bargaining (citing Hughes Tool Co. v. NLRB, 147 F.2d 69, 158 A.L.R. 1165 (5th Cir. 1945)) and the parties to assert the grievances (citing Douds v. Local 1250, Retail Wholesale Dep't Store Union, 173 F.2d 764, 9 A.L.R.2d 685 (2d Cir. 1949)), stated in language apposite to a consideration of the equities herein:

"[T]he union was the designated collective representative when the grievance arose * * * the rights involved arose out of an existing collective agreement, are vested, and the union may therefore lawfully vindicate these rights. In addition to legal considerations, allowing the union to perform this function has much to be said for it from both a practical as well as an equitable basis. The union negotiated the agreement and its provisions would be familiar terrain. Its knowledge of the provisions, their history and intent, would be superior to that of a successor union, or to that of the individual employees. Its experience with the grievance machinery, and its knowledge of the attitude and approach of company personnel would give it an important advantage over a successor union or individual employees. Moreover, the damage by loss of momentum or complete denial of rights because of time or other procedural requirements is obviated." (Id. at 1098.)

See also In re Busch Jewelry Co., 19 Lab. Arb. 365 (1952).

that the present and/or future status of the Association as representative of these employees will be impaired if Local 553 is permitted to arbitrate on behalf of its members the existence of prior allegedly vested rights.

Conceivably a problem may arise, as a result of the award, but it need not be anticipated and in the event that problems do arise, they can, of course, be dealt with when the arbitrator's award is sought to be confirmed. The possibility of problems is, of course, no reason to deny the requested relief sought herein. All these issues are in the first instance for the arbitrator and it must not be assumed by this Court that he will exceed his authority.

Accordingly, in view of Wiley's rationale and developing progeny, it may very well be that at least for the limited purpose of arbitrating grievances arising from allegedly subsisting and vested contract rights, the union which held bargaining rights with the predecessor and negotiated the agreement which has been held to be binding on the successor, continues to represent the predecessor employees for the limited purpose of arbitration of grievances arising from

the breach of those rights, and to that extent a vestige remains of the representative status of the predecessor organization. If that be the case where there is no union in the successor company's plant, I believe that the same should hold true in the instant case where the distinguishing feature is the presence of another union, now held by the Board to be the collective bargaining representative of these employees.[9] To hold otherwise by reason of the Board's decision is to overlook the presence of the same equities as were presented in Wiley and to deprive these employees, not only of an opportunity to have their chosen representative press their claims, but perhaps of an opportunity to press their claims at all.[10]

One point remains for decision, namely, whether the entire agreement devolved upon Humble and/or whether the Court is the forum wherein to adjudicate the issue.

The problem was succinctly stated and resolved in United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3d Cir. 1964), as follows:

"The opposing parties here have argued for and against the proposition

9. Mention should also be made of those employees not hired by Humble whose interests can only be protected by plaintiff. In addition, I should also note the obviously difficult position that the Association would be in, in prosecuting rights of the Weber & Quinn employees which may conflict with the rights of their members, and the fact that its desire to press these rights may understandably be less than that of Local 553.

10. Indeed, it is highly questionable whether a representative other than Local 553 (such as the Association) can even assert these grievances.

In United Electrical Workers v. Star Expansion Indus. Inc., 246 F.Supp. 400 (S.D.N.Y. April 13, 1964), the issue presented was whether a union newly certified as the exclusive bargaining agent of a group of employees previously represented by another, can displace the employee representative in an arbitration proceeding under a collective bargaining agreement with the prior union or whether the prior union signatory to the con-

tract retains the right to process the grievance.

The Court noted that the duty to arbitrate is contractual in origin (citing, inter alia, Wiley, supra) and that since an employer has no obligation to arbitrate in the absence of a contractual obligation the duties of the parties rest entirely upon the agreement. However, the Court noted the subsequently certified union has no agreement (i. e., was not a party to this agreement) and its status as newly-certified bargaining representative implies future responsibilities and looking to the formulation of a new contractual relationship.

Thus, the Court stated that the newly-certified union could not assert these rights under a contract to which it is a complete stranger (citing Local 1545, United Brotherhood of Carpenters and Joiners v. Vincent, 286 F.2d 127, 131 n. 5 (2d Cir. 1960)). Accordingly, the Court held that the employer should continue the arbitration with the party best suited to present the employees' grievances in their best light, i.e., the predecessor union.

that the collective bargaining agreement is unqualifiedly binding upon Reliance, as would have been the case if there had been an assignment or novation substituting Reliance as a party to the instrument. But, in the Wiley case, the Supreme Court seems to have been careful to avoid so broad a ruling. It merely reasoned and decided that federal labor law imposed upon a succeeding proprietor a duty to arbitrate those questions which his predecessor was bound to arbitrate under his labor contract. The fact that the plant covered by the labor contract had been closed and its employees mingled with other workers with independent and perhaps different rights at another plant may well have influenced this careful limitation of the Wiley holding.

In any event, we find implicit in the guarded language of the Wiley opinion, recognition and concern that new circumstances created by the acquisition of a business by a new owner may make it unreasonable or inequitable to require labor or management to adhere to particular terms of a collective bargaining agreement previously negotiated by a different party in different circumstances. Although the pre-existing labor contract indicates the structure of labor relations and the established practice of the shop at the beginning of the new proprietorship, an arbitrator of a subsequent complaint charging unwarranted departure from that scheme may properly consider any relevant new circumstances arising out of the change of ownership, as well as the provisions of and practices under the old contract, in achieving a just and equitable settlement of the grievance at hand. The requirements of the contract remain basic guides to the law of the shop, but the arbitrator may find that equities inherent in changed circumstances require an award in a particular controversy at variance with some term or terms of that contract. We do not imply that any departure from what was established under the old contract is justified by any special circumstances of this case. We do not know. And, in any event, this is a matter for the arbitrator's determination.

While this is not spelled out in the Wiley case, the power heretofore recognized in arbitrators to achieve justice in situations not contemplated by or not adequately covered in an existing collective bargaining agreement leads us to believe that analogous power exists here. Cf. United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. And see Cox Reflections on Labor Arbitration, 1959, 72 Harv.L.Rev. 1482, 1493–1498.

Our conclusion, therefore, is that the 1962 collective bargaining agreement, as an embodiment of the law of the shop, remained the basic charter of labor relations at the Bridgeville plant after the change of ownership. But, in the arbitration of any grievance asserted thereunder, the arbitrator may properly give weight to any change of circumstances created by the transfer of ownership which may make adherence to any term or terms of that agreement inequitable."

■ Similarly, in the case at bar, I merely hold that the grievances are arbitrable under an arbitration clause that survived the purchase, and devolved upon Humble, and that plaintiff is the party to press those grievances. The disputes noticed, absent the purchase, would have been arbitrable under the agreement. "It would be inconsistent with our holding that the obligation to arbitrate survived the merger were we to hold that the fact of merger without more removed claims otherwise plainly arbitrable from the

scope of the arbitration clause." (Wiley, supra, 376 U.S. at 554, 84 S.Ct. at 917.) However, I do not hold that the rights from whose breach the grievances arose survived the purchase and are binding upon Humble, or that the entire collective bargaining agreement survived the purchase. To decide that issue is to grant specific performance of the collective bargaining agreement and to usurp the function of the arbitrator. It is for him to fashion a remedy "in light of the fully developed facts" (Wiley, supra, at 555, 84 S.Ct. at 917), taking into consideration if he is so inclined "any change of circumstances created by the [purchase] * * * which make adherence to any term or terms of that agreement inequitable." United Steelworkers of America, supra, 335 F.2d at 895.

Accordingly, the motion for summary judgment, insofar as it requests a direction for defendant to proceed to arbitrate the disputes heretofore noticed, is granted and otherwise denied.

Settle order on notice in conformity herewith.