The MONROE SANDER CORPORATION, Plaintiff,

v.

David LIVINGSTON, individually and as the President of District 65 Retail, Wholesale and Department Store Union, AFL–CIO, Defendant.

LACQUER SPECIALTIES, INC., Plaintiff,

v.

David LIVINGSTON, individually and as the President of District 65 Retail, Wholesale and Department Store Union, AFL–CIO, Defendant.

Nos. 66 Civ. 1897, 66 Civ. 1950.

United States District Court
S. D. New York.

Nov. 17, 1966.

On Reargument Dec. 21, 1966.

Weiss, Bronston & Rosenthal, New York City, for Monroe Sander Corp.

George Moskowitz, New York City, for Lacquer Specialties, Inc.

Eugene Eisner, New York City, for defendant.

## MEMORANDUM

TENNEY, District Judge.

Plaintiffs Monroe Sander Corporation (hereinafter referred to as "Monroe") and Lacquer Specialties, Inc. (hereinafter referred to as "Lacquer") have moved herein for orders temporarily staying arbitration proceedings commenced by the defendant (hereinafter sometimes referred to as the "union"), pending the determination of plaintiffs' actions for declaratory judgments permanently staying said arbitration and vacating the notices of arbitration served on them by the union. The defendant union has moved for summary judgment in both actions. Because of the interlocking nature of the cases, I am considering them together.

Federal jurisdiction is invoked under Section 301(a) of the Labor Management Relations Act, 61 Stat. 156 (1947), 29 U.S.C. § 185 (1964). Plaintiffs seek declaratory judgments under the provisions of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (1964). The defendant union does not attack the jurisdiction of this Court, as indeed it could not. See Black-Clawson Co. v. International Ass'n of Machinists, 313 F.2d 179 (2d Cir. 1962); Application of Contessa Lingerie, Inc., 227 F.Supp. 37 (S.D. N.Y.1964). Nor does the union dispute Monroe's contention that federal law developed under the provisions of Section 301 of the Labor Management Relations Act is to be applied. Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Textile Workers Union, etc., v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

Accordingly, a discussion of the facts insofar as they are pertinent hereto is in order. For the most part, these are not disputed.

For over 40 years, Monroe owned and operated a plant in Long Island City, New York, for the manufacture of paints, lacquers, varnishes and enamels. Since February 1964, Monroe has been a subsidiary of the American Petrochemical Corporation (hereinafter referred to as "Petrochemical"). All of Petrochemical's plants are unionized. For over 25 years, Monroe's production employees were represented by the defendant union for the purposes of collective bargaining.

On June 15, 1964, a collective bargaining agreement was executed by Monroe and the union for a period of one year which set forth all the terms and conditions of employment. Said agreement provided that

any controversy, claim or dispute or grievance of any nature whatsoever arising between the Employer and the Union or any employees, including but not being limited to questions of meaning, interpretation, operation, or application of any clause of this agreement, or concerning any breach or threatened breach of this agreement by either party or concerning any acts, conduct or relations of whatsoever nature between the Union and the Employer, directly or indirectly * * *

shall be settled through a grievance procedure culminating in arbitration. After the expiration of said contract, on Octo-

ber 11, 1965 it was extended for an additional year retroactive from June 15, 1965 to June 15, 1966. The extension contained no increase in wages nor did it provide for any other direct economic benefit to the employees. The only changes made by said extension agreement related to eligibility rules for vacation and sick leave, none of which are relevant here. Monroe contends that the reason for the lack of any pay increase was the union's awareness of the company's perilous financial condition.

In January 1966, Monroe alleges that it began considering closing its plant and discontinuing production because of increasing losses. According to said corporation, this was necessitated by the deterioration of the plant buildings and the obsolescence of the machinery and equipment which resulted in an extremely low productivity rate. Accordingly, on January 28, 1966, Monroe advised the union of its plight, stating that

> "we may find it necessary to close the company entirely, move to a different plant which lends itself to greater production efficiency or combine the products of this plant with another operation of the [Petrochemical] company either now in existence or which may be acquired in the future." (Exhibit 2 to Reznick Affidavit, dated June 27, 1966.)

On March 25, 1966, the union wrote to Monroe advising said company that it would seek modification of the contract and asking Monroe to arrange a convenient date for a meeting. Monroe responded to this letter on March 30, 1966, setting forth its proposed modification of the collective bargaining agreement, to wit: extension of the present agreement to October 31, 1966, at which time it would expire in its entirety.

At the beginning of April 1966, meetings were held by Monroe with the union representatives and later with the employees, at which Monroe detailed its problems and the union responded with a demand for a new contract.

At about the same time, Monroe advised the union that Petrochemical was considering the acquisition of Lacquer, a New Jersey corporation engaged in the manufacture of paints and lacquers. The union was told that Lacquer had the capacity to produce sufficient paints and lacquers to fulfill the requirements of Monroe's remaining customers.[1]

No written answer was received by Monroe to its proposal of March 30, 1966 until April 22, 1966, when the union, seemingly oblivious to the financial position of Monroe, submitted a counterproposal setting forth demands for a two-year contract with a wage increase of $6.50 per week for each employee for each year of the contract, a cost-of-living review every six months, and other proposals not entirely pertinent hereto.

On April 28, 1966, Petrochemical signed an agreement with Lacquer to acquire its assets and business. As of the date of the argument of this motion (August 9, 1966), no closing had taken place since the agreement was contingent upon the fulfillment of several conditions, including the obtaining of a favorable tax ruling from the Treasury Department.

Meanwhile, in or about the second week of May, and continuing into the early part of June 1966, the employees of Monroe began activity designed to interrupt said corporation's production by means of excessive absenteeism, slowdown of work and sabotage.[2]

On May 30, 1966, Monroe, as a result of this interference with production and because of the union's alleged refusal to

---

1. Shortly thereafter, Monroe notified its customers of Petrochemical's intent to acquire Lacquer. Monroe contends that this was done in an effort to salvage as many of Monroe's customers as possible without letting said customers know of the financial difficulties.

2. Plaintiff alleges that the union condoned this activity. Leslie A. Roberts, the union organizer, states in his affidavit of August 4, 1966 that he spoke to the Monroe employees on several occasions and warned them that their action was not being supported by the un-

discuss said corporation's problems, wired the union offering to meet on June 1, 1966. Said offer was accepted, and at that time the problems of Monroe were discussed. At about the same time, the union raised the issues of the "Moving Clause"[3] and the "Basic Crew Clause"[4] of the collective bargaining agreement.

On June 4, 1966, Monroe, as a result of the June 1, 1966 meeting, submitted a further proposal to the union, substantially similar to the proposal of March 30, 1966, but additionally offering Monroe's employees preferential hiring at Lacquer for a four-month period commencing June 15, 1966, provided Petrochemical acquired ownership of Lacquer and jobs became available. Monroe asserts that no jobs are presently available at Lacquer but there might be a possibility of employment opportunity if Lacquer were able to acquire Monroe's customers. However, Monroe further alleges that this would seem remote since the Lacquer production staff could handle a substantial increase in workload without the need for additional employees.

Monroe contends the union insisted that jobs be made available immediately for all the Monroe production employees and that the Lacquer employees must be fired. The Lacquer production employees do not belong to a union and have resisted organizers' overtures to them concerning union representation.[5] The union argues that it did not ask for full employment of Monroe employees at Lacquer; rather it contends that at least some employees must be hired immediately.

Upon failure to reach agreement, counsel for the union, on June 7, 1966 (8 days before the termination of the contract), served upon both Monroe and Lacquer a demand for arbitration "concerning the Company's current breach and its threatened removal of its operations from Long Island City to Lacquer Specialties, Inc., in Newark, New Jersey, in derogation of the rights of the Union and the employees

ion and that any future interference with production would not be tolerated. Whether the union condoned these activities is immaterial. It is clear from the Roberts affidavit that the acts complained of in fact occurred. At any rate, the only purpose in setting forth this fact is to detail all of the facts leading up to the disagreement. In the determination of the various contentions of the parties no weight is given to the interference with production.

3. Clause 25 of the collective bargaining agreement provides:

25. MOVING CLAUSE

The Employer agrees that he shall not at any time move his shop or operation from its present location to any place beyond reasonable commuting distance within the greater Metropolitan Area of New York. Reasonable commuting distance shall be construed as being within fifty (50) miles of New York City or Newark, New Jersey. In the event the plant is moved within the limits proscribed above and an employee elects not to transfer to the new location he shall be eligible for severance pay in accordance with Article 24 of this Agreement.

4. Clause 28 of the collective bargaining agreement provides:

28. BASIC CREW

The Employer agrees to employ, during the term of his Agreement and subject to the conditions hereinafter stated, eighteen (18) employees who shall constitute the basic crew. * * * The requirement of a basic crew shall have no application where the Employer is obliged to discontinue operations in the plant in whole or in part by reason of an emergency or any cause beyond the control of the Employer.

5. The fact that there is no union at Lacquer distinguishes the instant case from McGuire v. Humble Oil & Ref. Co., 247 F.Supp. 113 (S.D.N.Y.), rev'd, 355 F.2d 352 (2d Cir. 1965), cert. denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966), where the Court of Appeals, in reversing the District Court found that arbitration by the successor corporation would not be required where said successor's employees were union members. The basis for this holding was that *Wiley* should be limited where requiring the successor to arbitrate would cause industrial strife. Industrial strife was found by the Court because of the presence of the second union. See 66 Colum.L.Rev. 967 (1966).

it represents." Negotiations were suspended on June 13, 1966, and on June 23, 1966, the union struck Monroe and commenced picketing at both Monroe's and Lacquer's plants.

The New York State Board of Mediation advised Monroe and Lacquer that if an arbitrator was not chosen by June 28, 1966, an arbitrator would be chosen for them. Both companies then commenced the abovementioned suits in the federal court.

 It is clear that it is the function of the Court to determine whether a recalcitrant party has breached his duty to arbitrate. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); United Steelworkers v. Warrior & Gulf Nav. Co., supra; McGuire v. Humble Oil & Ref. Co., 247 F.Supp. 113, 117 (S.D. N.Y.), rev'd on other grounds, 355 F.2d 352 (2d Cir. 1965), cert. denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966). However, before it can be determined that there has been a breach, it must be determined that there has been an agreement to arbitrate the particular dispute. See John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 547, 84 S. Ct. 909; McGuire v. Humble Oil & Ref. Co., 247 F.Supp. at 117. For certainly there can be no breach without the existence of a contract.

 With this in mind, an examination of the facts as they relate to Monroe is in order for it is clear that if Monroe is not bound by the agreement Lacquer would not be bound either.[6] The arbitration clause of the collective bargaining agreement between Monroe and the union, as set forth supra, is indeed a broad one covering "any controversy * * * whatsoever arising between the Employ-er and the Union." Monroe argues that because of Proctor & Gamble Independent Union v. Proctor & Gamble Mfg. Co., 312 F.2d 181 (2d Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963), it is not required to submit to arbitration of the union's disputes. In the *Proctor & Gamble* case, however, the dispute clearly arose after the termination date of the collective bargaining agreement, whereas here it is apparent that some part of this dispute arose within the terms of the collective bargaining agreement. This is evidenced by the undisputed fact that the notice of arbitration was served prior to the termination date of the collective bargaining agreement.[7] The specific holding of *Proctor & Gamble* as far as applicable herein is that "Grievances which are based upon conditions arising *during the term of the agreement to arbitrate* are arbitrable after that term has ended." Id., 312 F.2d at 186. In the instant case, it is unquestioned that the dispute as to employment rights at Lacquer arose during the time that the collective bargaining agreement was in effect. Examining the collective bargaining agreement, I cannot state that this dispute would not fall within said agreement. Piano and Mutual Instrument Workers v. W. W. Kimball Co., 221 F.Supp. 461 (N.D.Ill.1963), rev'd, 333 F.2d 761 (7th Cir.), rev'd per curiam, 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964); cf. Zdanok v. Glidden Co., 216 F.Supp. 476 (S.D.N.Y.1963), aff'd, 327 F.2d 944 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); General Warehousemen Union v. American Hardware Supply Co., 329 F. 2d 789 (3d Cir.), cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964). In fact, at least part of the union's argument would relate to specific clauses of the agreement, to wit: the aforementioned "Moving" and "Basic Crew" clauses. (See footnotes 3 and 4.)

---

6. It does not follow, however, that a determination that Monroe is bound will *ipso facto* bind Lacquer to the agreement.

7. This does not mean that in every case where arbitration is sought prior to the termination of the collective bargaining agreement, it will be found that the dispute is within the scope of the agreement. But as in the instant case, where there is a broad arbitration clause, the time of the demand for arbitration may be considered.

■ However, even if there were any doubt in my mind as to the applicability of the arbitration clause, my decision would still be the same. "An order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Doubts should be resolved in favor of coverage.*" United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353 (1960). (Emphasis added.)

■■ Monroe contends that by allowing this dispute to go to arbitration an award to the union would, in effect, cause Lacquer to commit an unfair labor practice since it would require Lacquer to discharge present employees to make room for the Monroe employees. Whether Lacquer has room for additional employees is for the arbitrator to determine. "Whether or not the Union's demands have merit will be determined by the arbitrator in light of the fully developed facts." John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 555, 84 S.Ct. at 917. In addition, even though the arbitrator may determine that no valid award can be made because any such award would constitute an unfair labor practice, this may still have the effect of leading to industrial peace. See Carey v. General Elec. Co., 315 F.2d 499, 507–508 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964). In addition, abuse of the arbitrator's authority may be remedied in an action to vacate the award. Id. at 508.

Accordingly, it is my conclusion that even assuming Monroe's version of the facts, the dispute, as to Monroe, is arbitrable and, therefore, defendant union's motion for summary judgment is granted as to Monroe.

A determination of Lacquer's relationship to the agreement presents an infinitely more difficult problem. Any discussion of the union's rights as against Lacquer must begin with a thorough examination of John Wiley & Sons, Inc. v. Livingston, supra, and the line of cases emanating therefrom.[8]

In *Wiley*, the defendant union entered into a collective bargaining agreement with Interscience Publishers, Inc., with said agreement to expire on January 31, 1962. On October 2, 1961, Interscience was merged into Wiley. No contention was made that the merger was for other than genuine economic reasons. Substantially all the employees of Interscience continued in Wiley's employ. The union claimed to represent said employees despite the merger. Wiley contended that the merger terminated the collective bargaining agreement. One week before the termination date of said agreement and some three months after the merger, the union commenced action to compel arbitration.

After holding that the Court must determine if the arbitration clause survives the merger (376 U.S. at 546, 84 S.Ct. 909), the Supreme Court stated that

"the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, *in appropriate circumstances, present here,* the successor employer may be required to arbitrate with the union under the agreement." Id., at 548, 84 S.Ct. at 914. (Emphasis added.)

However, the Court continued, in a case where there was a "lack of any substantial continuity of identity in the business enterprise before and after a change," the duty to arbitrate would become "something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." Id. at 551, 84 S.Ct. at 915. In addition, failure on the part of the union to notify the successor of an intent to hold the latter to the agreement

8. For comment on *Wiley* see, e. g., 6 Boston College Indus. & Commercial L.Rev. 344 (1965); The Supreme Court, 1963 Term, 78 Harv.L.Rev. 179, 285–288 (1964); 1964 U.Ill.L.F. 847; Note, 113 U.Pa.L.Rev. 914 (1965).

might constitute an abandonment of the right to arbitration.[9] Ibid.; The Supreme Court, 1963 Term, 78 Harv.L.Rev. 179, 288 (1964).

The *Wiley* Court found substantial continuity of identity because of "the wholesale transfer of Interscience employees to the Wiley plant". 376 U.S. at 551, 84 S.Ct. at 915. In practically all of the decisions following *Wiley*, the determination of similarity of operation and continuity of identity depended, at least in part, upon the employees of the merged corporation remaining in the employ of the successor. See United Steelworkers v. Reliance Universal Inc. of Ohio, 335 F.2d 891 (3d Cir. 1964); Wackenhut Corp. v. International Union, United Plant Guard Workers, 332 F.2d 954 (9th Cir. 1964); McGuire v. Humble Oil & Ref. Co., 247 F.Supp. 113 (S.D.N.Y. 1965), rev'd on other grounds, 355 F.2d 353 (2d Cir. 1966). Clearly, however, this is not the only factor to be considered in determining continuity of identity, for, if that were the case, *Wiley* could be easily avoided by the successor corporation's refusal to hire the predecessor's employees. Compare Drivers Union v. Wisconsin Employment Relations Bd., 29 Wis.2d 272, 138 N.W.2d 180 (1965). Also to be considered are "the similarity in work performed by the employees, the similarity in the employing industry, and in the employment relationship." McGuire v. Humble Oil & Ref. Co., 247 F. Supp. at 119. Any doubts should be resolved in favor of arbitration. United Steelworkers v. Warrior & Gulf Nav. Co., supra 363 U.S. at 583, 80 S.Ct. 1347.

Since the Supreme Court has laid down no guidelines for the determination of continuity of identity (McGuire v. Humble Oil & Ref. Co., 247 F.Supp. at 118), it would surely be inappropriate to set down any essential factors without which *Wiley* would be inapplicable. Rather, the determination in each case must depend upon its own peculiar facts. This becomes clearer from an examination of Piano Workers Union v. W. W. Kimball Co., 333 F.2d 761 (7th Cir.), rev'd per curiam, 379 U.S. 357, 85 S.Ct. 441, 13 L. Ed.2d 541 (1964). In that case, the defendant corporation entered into a collective bargaining agreement with the plaintiff union, with said agreement to terminate October 1, 1961. On August 15, 1961, Kimball notified the union of an intent to discontinue operations and, on August 17, 1961, all work ceased at the corporation's Illinois plant. On October 9, 1961, Kimball began hiring employees to work at a new plant in Indiana. The Court of Appeals held *Wiley* inapplicable because of a failure to establish continuity of identity in that the new plant was in a location far removed from its successor, the new operation was substantially different than the old one, and the employees had not requested transfer. In a per curiam opinion, the Supreme Court reversed the Court of Appeals on the authority of *Wiley*. It is difficult to determine the exact reasons for the reversal since the facts of *Kimball* are distinguishable from *Wiley*, as demonstrated by the Court of Appeals' reasoning, supra. Accordingly, the reversal by the Supreme Court only indicates that *Wiley* can by no means be limited to its own facts.

Turning my attention to the instant case, I find that:

1. Both Lacquer and Monroe are in the same type of business.

2. The fact that the Monroe employees were offered preferential hiring indicates that the jobs in the two plants had some similarity.

3. Lacquer intends to attempt to salvage as many of the Monroe accounts as is possible. Hence, there is a possibility that many of the customers would be the same.

4. The Monroe plant and the Lacquer plant are both within the New York City metropolitan area so that hiring Monroe's production employees at Lacquer's

---

9. This poses no problem in the case at bar since, admittedly, Lacquer was given notice by the union of the latter's intent to hold Lacquer to the arbitration clause of the collective bargaining agreement.

plant would not cause "the uprooting of a man's family from the community in which it lived"—a factor relied upon by the Court of Appeals and tacitly held insufficient by the Supreme Court in *Kimball.*

■ It is my considered opinion that these factors, when taken together, are sufficient to bring the instant case within the rationale of *Wiley* and constitute sufficient continuity of identity to bind Lacquer to the Monroe arbitration clause. I do not think that the *Wiley* rationale would permit a parent corporation to discontinue operation of one subsidiary, acquire another subsidiary and consequently avoid the discarded subsidiary's collective bargaining obligations.

■ However, in *Wiley* and the cases arising therefrom, the mergers or sales were complete before the dispute was ripe for court determination. See, e. g., United Steelworkers v. Reliance Universal Inc. of Ohio, supra; Wackenhut Corp. v. International Union, United Plant Guard Workers, supra. In my opinion, this would have no effect on *Wiley's* rationale, but would only have a bearing on the form of the relief to be granted. The relief sought by the union through arbitration is based on alleged pre-acquisition rights. The union seeks only to assert rights based on the Monroe agreement, now expired, and not to negotiate a new agreement. John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at 551, 84 S.Ct. 909. These rights continue to exist regardless of the acquisition so that once Petrochemical formally acquires Lacquer the Monroe rights will be in no way affected.

Accordingly, I hold that defendant's motion for summary judgment should be granted as against Lacquer. However, arbitration is to be deferred as to Lacquer until said corporation is formally acquired by Petrochemical.

The motions are disposed of in accordance with this opinion.

It is so ordered.

## MEMORANDUM ON REARGUMENT

TENNEY, District Judge.

Plaintiffs in the above-entitled actions jointly move for reargument of a decision of this Court dated November 17, 1966, in which summary judgment was granted for the defendant union in both cases. Because of the novel questions of law involved, oral reargument has been permitted. The grounds for reargument are (1) that a decision of the National Labor Relations Board, dated the same day as this Court's opinion, clearly shows that plaintiff Monroe Sander Corporation (hereinafter referred to as "Monroe") bargained in good faith with the defendant union and did not violate the National Labor Relations Act by its actions; (2) that any arbitrator's award ordering employment of Monroe employees at Lacquer Specialties, Inc. (hereinafter referred to as "Lacquer") would cause the plaintiffs to commit an unfair labor practice in violation of the National Labor Relations Act; and (3) that the dispute arose after the expiration of the collective bargaining agreement.

*The Decision of the National Labor Relations Board.*

■ The NLRB, in refusing to issue a complaint and in dismissing the union's charges, found that Monroe closed down its Long Island City operation for economic reasons, did not lock out its employees, and bargained in good faith concerning the shutdown of the Monroe plant and the rehiring of the Monroe employees at the Lacquer plant in New Jersey. In addition, the Board determined that Monroe's failure to provide jobs for its employees at the Lacquer plant was not unlawful. Plaintiffs allege that because of these findings, the Court's decision cannot stand, since any possible arbitrator's award would be incompatible with the decision of the NLRB. These findings of the Board were withdrawn on the following day, but the reason for said withdrawal is not clear.

Assuming, *arguendo*, that the Board's findings were still in effect, this does not in any way affect the Court's determination. To say that the plaintiffs' conduct did not amount to an unfair labor practice is far different than stating that arbitration clauses of valid collective bargaining agreements cannot be enforced by the federal courts. See International Harvester Co., 138 N.L. R.B. 923 (1962); cf. Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 270–272, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). Indeed, the facts found by the NLRB are identical to the facts found by the Court. The conclusions of law are different, however, as indeed they must be since dissimilar issues involving different concepts of law were being decided. Accordingly, this contention of the plaintiffs is dismissed as not probative of the issues presented to me for determination.

### Effect of an Arbitrator's Award.

█ Plaintiffs argue that any award of an arbitrator granting employment of Monroe employees at Lacquer would cause said plaintiffs to violate Section 8(a) (3) of the National Labor Relations Act, 61 Stat. 140 (1947), as amended, 29 U.S.C. § 158(a) (3). I do not see how an employer will be guilty of union discrimination when it is acting pursuant to an arbitrator's award since, historically, a violation of this subsection depends upon an intent of the employer to discriminate. See American Ship Bldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Plaintiffs have not pressed this point too strongly and it is the Court's opinion that it can be disposed of summarily, and, accordingly, it is dismissed.

### The Time that the Dispute Arose.

Plaintiffs argue that the Court erred in finding that at least some part of the dispute arose during the life of the collective bargaining agreement. They point to the Court's statement that the date the dispute arose is evidenced by the time that the Notice of Arbitration was served. However, plaintiffs are being less than candid because the Court did point out that this is one of the factors that *may* be considered. Although it is normally true that the time of service of a Notice of Arbitration is no evidence of the date that the dispute arose, it is my opinion (as set forth in note 7 of the original memorandum) that where the arbitration clause is as broad as that in the case at bar, such time of service is definitely a factor to be considered (although certainly not the only factor).

Clause 12 of the collective bargaining agreement provides that arbitration shall be available for the settlement of

"any controversy, claim or dispute or grievance of any nature whatsoever * * * including but not being limited to questions of meaning, interpretation, operation, or application of any clause of this agreement, or *concerning any breach or threatened breach of this agreement* by either party *or concerning any acts, conduct or relations of whatsoever nature* between the Union and the Employer, directly or indirectly * * *" (Emphasis added.)

From the plain language of this clause, it is concluded that the within dispute is within the terms of the collective bargaining agreement for the following reasons:

█ First, the broad language of the agreement does not limit arbitrable issues to disputes per se. Indeed, the clause speaks of disputes, controversies, grievances, claims or any conduct whatsoever. The language is similar to that appearing in Piano Workers v. W. W. Kimball Co., 221 F.Supp. 461 (N.D.Ill. 1963), rev'd, 333 F.2d 761 (7th Cir.), rev'd per curiam, 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964), where the District Court indicated that the language "any difference" was so broad as to include the interpretation of the arbitration clause itself as a question for the arbitrator. 221 F.Supp. at 463. Although I do not think that this Court need go quite so far, assuming that a "dispute" did not arise until after the

termination of the contract, given the scope of the arbitration clause present in the instant case, can it be said that arbitration is precluded? Clearly, something other than a dispute was present during the life of the agreement; *i. e.*, a claim or a controversy or a difference arising out of the acts, conduct or relations of any nature between the parties. And if this is the *case*, clause 12 may be invoked to submit the issue to arbitration. Although Monroe argues that the effect of the Court's decisions is to compel arbitration of matters normally reserved for negotiation, does this amount to anything more than complying with the clear intent of the parties? Where there is a broad arbitration clause, arbitration of a particular grievance will not be denied unless expressly excluded by the agreement. United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347 (1960); International Union of Elec. Workers v. General Elec. Co., 332 F.2d 485 (2d Cir.), cert. denied, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964).

Secondly, the collective bargaining agreement clearly states that arbitration could be demanded for threatened breaches of the agreement. This appears to be the precise ground relied upon by the defendant union. If this is so, the Court will not determine the merits of the plaintiffs' claim but will leave this issue for the arbitrator. The very language of this portion of the grievance procedure indicates an intent by the parties to resolve differences prospectively. And if, as claimed by the union, Monroe would be breaching the agreement by refusing to replace some Lacquer employees with Monroe production workers, this would be subject to arbitration, even if the event were not to take place until after the termination date of the agreement. Here the date of the breach would not be the critical date; the important moment would be the time that the "threat" occurred. And that time clearly would be during the life of the contract.

Although Monroe's counsel has argued persuasively, I am not convinced that Proctor & Gamble Independent Union v. Proctor & Gamble Mfg. Co., 312 F.2d 181 (2d Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963) would require a different result.

Plaintiffs argue that if Proctor & Gamble had decided to fire an employee while the agreement was effective and had merely postponed the discharge until after the termination date, the Court would have reached the same result. I cannot agree with this since the Court stated that grievances based upon *conditions* arising during the term of the agreement are arbitrable after the termination date of said agreement. It cannot be seriously argued that a decision thus reached during the life of the agreement would not be subject to arbitration. Turning to the instant case, assuming, for the moment that the clause was as restrictive as Proctor & Gamble's, the same result would be reached since the disagreement relates to a *condition* (the proposed closing) in existence during the life of the agreement.

However, as I stated in the November 17, 1966 decision herein, even if there were any doubt as to this issue, the decision would stand unless the arbitration clause was not capable of being interpreted in a manner that would cover the dispute. United Steelworkers v. Warrior & Gulf Nav. Co., supra, 363 U.S. at 582–583, 80 S.Ct. 1347 (1960). Accordingly, taking into consideration the wide scope of the arbitration clause and the national policy in favor of arbitration, I conclude that the dispute is subject to arbitration.

*Miscellaneous Contentions.*

Plaintiffs make several other contentions, only one of which requires discussion here since the other allegations were resolved in the November 17, 1966 decision. Plaintiffs inform the Court that the sale of Lacquer to American Petrochemical Corp. had been consummated as of the date of the oral argument of the original motion. For this additional reason, plaintiffs contend that

the decision was erroneous. However, as clearly stated in the opinion, the time of the acquisition will only have a bearing on the form of relief. If what plaintiffs allege is true, the only bar to immediate arbitration is removed. It is difficult to see how this factor would improve plaintiffs' position.

Accordingly, plaintiffs' motion for reargument is granted, and, after due consideration upon reargument, the Court adheres to its original decision.

So ordered.