422 F.2d 59
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
UNITED INDUSTRIAL WORKERS OF the SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC GULF, LAKES AND INLAND WATERS DISTRICT, AFL-CIO, Respondent.
 No. 27480.
 United States Court of Appeals, Fifth Circuit.
 February 13, 1970.
 
 Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Joseph C. Thackery, Attys., N.L.R.B., Washington, D. C., Clifford Potter, Director, Region 23, N.L.R.B., Houston, Tex., for petitioner.
 Joel Field, Schulman, Abarbanel & Kroner, Howard Schulman, Jack L. Kroner, New York City, for respondent.
 Before GEWIN, COLEMAN and DYER, Circuit Judges.
 DYER, Circuit Judge:
 
 
 1
 The circumstances of this labor dispute are now before the Court for the fourth time.[1] The National Labor Relations Board (NLRB) petitions for enforcement of its order that the Seafarers International Union (SIU) halt picketing designed to force Port Richmond Elevator Company to recognize or bargain with SIU as the representative of the employees at Port Richmond's Elevator B in Galveston, Texas, and that SIU post notices there that such picketing not be conducted in the future.
 
 
 2
 The order was based upon the Board's determination that SIU's picketing was an unfair labor practice violative of Section 8(b) (7) of the Act.[2] This section prohibits a non-certified union from picketing with the object of forcing recognition of that union unless a representation petition is filed under Section 9(c)[3] within thirty days of the commencement of the picketing. The sole issue before us is the propriety of the Board's determination that SIU was not "currently certified as the representative" of the Port Richmond employees within the meaning of Section 8(b) (7). The NLRB gave alternative bases for its finding that SIU was not currently certified, both of which SIU contends are erroneous: (1) a previous certification by the National Mediation Board (NMB) of SIU as the appropriate bargaining unit had no continuing validity vis-a-vis Port Richmond because Port Richmond was not a "successor" to Galveston Wharves, and (2) the NMB certification was not required to be recognized by the NLRB because it perpetuated bargaining units whose chief distinction was one of race. We have determined that substantial evidence on the record as a whole supports the Board's finding that Port Richmond was not a successor employer to Galveston Wharves and we therefore enforce the order without the necessity of reaching the second basis of the Board's conclusion.
 
 
 3
 The record shows that Galveston Wharves was discouraged by falling revenues in its operation of Elevator B. Therefore, in July of 1964 it entered into an agreement whereby, effective August 1, 1964, Port Richmond would lease and operate the elevator for a five year period. The lease was subject to renewal. At the time of the lease, SIU was certified by NMB under the Railway Labor Act to represent the "inside" employees of the elevator.[4] The 34 "inside" employees for whom SIU was so certified, all Caucasians who worked a regular 5 day, 40 hour week, were engaged in the actual physical operation of the elevator.
 
 
 4
 Another unit, also white, was comprised of 8 or 9 electricians who worked in Elevator B and at other Galveston Wharves elevator and dock operations. The International Brotherhood of Electrical Workers was certified by the NMB to represent this unit.
 
 
 5
 A third unit, the "outside" employees, was represented by Local 1513 of the International Longshoremen's Association, which had also been certified by NMB. This unit performed such work as loading and unloading boxcars, cleaning, and oiling. The amount and availability of this work varied greatly and the number of "outside" employees employed on a single occasion ranged from 45 to 110. The unit was comprised of Negroes and a few Mexicans. Their pay was about 10 percent lower on the average than the pay of the "inside" employees. There was no interchange between them and the "inside" employees and there were no promotions across the two units.
 
 
 6
 It became apparent prior to the August 1 effective date of the lease that Port Richmond would not assume any of the collective bargaining agreements from Galveston Wharves. In anticipation of the lease Galveston Wharves posted notices that all of its employees would be permanently discharged effective on July 31.[5] When Port Richmond took over the operation of Elevator B on August 1, 1964, SIU began picketing and continued to picket until December 18 of that year when an injunction issued requiring its cessation.
 
 
 7
 At about the time of the takeover, Port Richmond requested and received from Galveston Wharves a list of its employees. On August 5 each of them was sent a letter of invitation to apply for jobs at Elevator B. All of the SIU members ("inside" employees) received this letter. Applications were made available at Elevator B and some were picked up by union officers. However, for reasons not apparent on this record, only one of the SIU complement applied for a job. He was hired in October, as soon as hiring began.
 
 
 8
 When it took over, Port Richmond made many mechanical and operational changes in the Elevator B operation. It also realigned its employee classifications in a way which effected the elimination of the distinction between "inside" and "outside" employees. The job duties were commingled and the former distinctions became merged into a single pay structure with uniform chances for advancement and free opportunity for transfer across the old unit lines.
 
 
 9
 SIU resists enforcement of the Board's order solely on the ground that its picketing does not come within the proscription of Section 8(b) (7) because, by virtue of the NMB certification, SIU was, at the time of the picketing, "currently certified as the representative of such employees." SIU contends that the NMB certification is binding on Port Richmond as a successor to Galveston Wharves.
 
 
 10
 The NMB certification provided that SIU was the bargaining representative for the inside "employees of Galveston Wharves, its successors and assigns." (Emphasis added). In previous litigation arising out of the employment problems created by the lease from Galveston Wharves to Port Richmond another panel of this Court held that for Railway Labor Act purposes the italicized language did not constitute Port Richmond a "successor employer" because Port Richmond was not a carrier within that Act[6]
 
 
 11
 We agree with the Board that neither this language in the NMB certification nor the successorship doctrine enunciated in John Wiley & Sons v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L. Ed.2d 898, makes Port Richmond a successor employer to Galveston Wharves for the purposes of the National Labor Relations Act either. Wiley teaches that where there is substantial similarity of operation and continuity of identity when the second employer takes over, a collective bargaining agreement entered into by the predecessor employer containing an arbitration provision is binding upon the successor. Wackenhut Corporation v. International Union, United Plant Workers, 9 Cir.1964, 332 F.2d 954. Although it may not necessarily be determinative, the finding of similarity of operation and continuity depends, at least in part, upon whether there is a change in the personnel of the employee unit. E. g., Monroe Sander Corporation v. Livingston, S.D.N.Y.1966, 262 F.Supp. 129, aff'd, 377 F.2d 6, cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).
 
 
 12
 In the instant case all of the employees represented by SIU had been discharged by Galveston Wharves before Port Richmond took over operation of Elevator B. There is no hint in this record that the elevator lease or the resultant employee discharge were motivated by anti-union animus. In spite of the fact that Port Richmond invited all of the SIU employees to apply for jobs, only one did so. Thus, Port Richmond's work force contained only one person who was represented by SIU in the previous NMB certified unit.
 
 
 13
 SIU argues that the fact of a change in personnel should be irrelevant because an employer could easily avoid the obligations that are otherwise imposed upon him by application of the Wiley successorship doctrine simply by a "refusal to hire the predecessor's employees." Monroe Sander Corporation v. Livingston, supra, 262 F.Supp. at 136. We think this reasoning sound. However, the record in this case clearly shows that there was no refusal to hire the former employees. Port Richmond invited all of them to apply for jobs and hired the only one who did. It is thus apparent that Port Richmond acted in the best of faith and that the employees comprising the NMB certified "inside" unit were themselves responsible for the lack of identity between the Galveston Wharves and Port Richmond personnel. In light of these facts we agree with the reasoning of N. L. R. B. v. John Stepp's Friendly Ford, Inc., 9 Cir.1964, 338 F.2d 833. There the Ninth Circuit noted that while other courts had wrestled with the problem which arises when there is a new owner and a substantial change in the personnel of the employee unit,
 
 
 14
 [T]he situations before them have been confused by the fact that in most cases either the change in ownership or the change in the employee personnel has been brought about under circumstances suggesting a lack of good faith and an attempt, on the part of the employer, to avoid the effect of the certification. Here there is no such suggestion.
 
 
 15
 The controlling question here, it would seem to us, is whether the new owner may rationally be said in substance, as to the unit in question, to have taken over and succeeded to his predecessor's employees. If he has not — if, on the contrary, he has within the unit in question secured his own employees — then he is not, as to the employees in question, a successor. He is their original employer. In such case both the employer and the employee unit are strangers to the certification and to the election upon which it was based. Nothing remains of the relationship to which the certification attached. Under such circumstances, in our judgment, the certification cannot stand.
 
 
 16
 Id. at 836.
 
 
 17
 It did not matter to the court in Friendly Ford that, apart from lack of identity of personnel, there might have otherwise been a continuity of business operations. See note 8 at p. 836 of that opinion. That is, on the facts of Friendly Ford the Ninth Circuit deemed lack of employee identity conclusive of the successorship issue.
 
 
 18
 Likewise, on the particular facts of this case[7] — where Port Richmond did not take over any of Galveston's employees, as they had all been discharged prior to August 1 and there was, therefore, no unit to which the certification could attach; there is no hint either of an attempt to avoid the certification or of anti-union animus on the part of either the predecessor or the succeeding employer in effectuating the take-over; there was no refusal to hire the former employees but, on the contrary, invitations were extended to all of them; and there was substantial lack of identity between personnel under the predecessor and succeeding employers — we hold that Port Richmond is a stranger to the NMB certification and is not a successor employer bound thereby.
 
 
 19
 Accordingly, at the time of the picketing, SIU was not the currently certified representative of the "inside" employees and the Board properly found that picketing without filing the representation petition required by Section 8(b) (7) (C) was an unfair labor practice.
 
 The order of the NLRB is
 Enforced.[8]
 
 
 Notes:
 
 
 [1]
 See the three opinions handed down in United Industrial Workers of the Seafarers International Union v. Board of Trustees, appearing at 5 Cir., 351 F.2d 183; 368 F.2d 412; and 400 F.2d 320, cert. denied, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219
 
 
 [2]
 29 U.S.C.A. § 158(b) (7) provides in part:
 (b) It shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 (7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
 * * * * *
 (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: * * *"
 
 
 [3]
 29 U.S.C.A. § 159(c)
 
 
 [4]
 Galveston Wharves is a common carrier subject to the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and hence is subject to the jurisdiction of the NMB. Port Richmond, however, is not a carrier subject to the Railway Labor Act and is an employer within the National Labor Relations Act. See text at footnote 6,infra.
 
 
 [5]
 On July 20, 1964, Galveston Wharves placed a notice on the bulletin board that it planned to lease the elevator and that all employees would be subjected to "permanent lay off" on July 31. Another panel of this Court held in the Railway Labor Act suit for injunction that this notice amounted to a permanent discharge: [T]his was [not] a temporary layoff * * * This was it — final, positive, all washed up. The Carrier [Galveston Wharves] made that clear by posting what it euphemistically calls its `layoff notice' * * *." United Indus. Wkrs. of Seafarers, Etc. v. Board of Trustees, 5 Cir. 1965, 351 F.2d 183, 189
 
 
 [6]
 351 F.2d at 187-88. See Footnote 5,supra.
 
 
 [7]
 The facts of the instant case may even be stronger than those of Friendly Ford because not only is there a lack of identity between the personnel of the prior employer and the new employer within the employee unit, but here there is also the additional factor of a lack of identity between the employeeunits under the two employers, since Port Richmond changed the old "inside"-"outside" dichotomy.
 
 
 [8]
 Lest it be thought that the "inside" employees have been left without recourse, it should be pointed out that in prior decisions this Court has already ordered Galveston Wharves to negotiate a settlement with the SIU as the bargaining agent of these employees for firing them in contravention of the notice requirements of the Railway Labor Act. See cases cited in footnote 1,supra.